## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN CIANTI,  on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| HARMAN INTERNATIONAL INDUSTRIES, INC.,  DINESH PALIWAL,  ADRIANE BROWN,  JOHN DIERCKSEN,  ANN  MCLAUGHLIN  KOROLOGOS,  EDWARD MEYER,  ROBERT NAIL,  AVI REICHENTAL,  KENNETH  REISS,  HELLENE  RUNTAGH,  FRANK SKLARSKY, and  GARY STEEL, | ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED CLASS ACTION COMPLAINT |
| Defendants. | ) | |

Plaintiff John Cianti ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this shareholder class action on behalf of himself and all other public shareholders of Harman International Industries, Incorporated ("Harman" or the "Company") against Harman and Harman's Board of Directors (the "Board" or the "Individual Defendants") (collectively with Harman, the "Defendants"), challenging a stock and cash transaction by which South Korea-based Samsung Electronics Co. Ltd., through its subsidiaries Samsung Electronics America, Inc. and Silk Delaware, Inc. ("Merger Sub," collectively with Samsung Electronics Co. Ltd. and Samsung Electronics America, Inc., "Samsung")  will acquire

each issued and outstanding share of Harman for $112.00 per share in cash (the "Proposed Transaction" or "Merger"). Both companies' boards of directors have approved the deal.

2.       Pursuant to the terms of the definitive Agreement and Plan of Merger entered into by and among Harman and Samsung on November 14, 2016 (the "Merger Agreement"), Samsung will acquire all of the outstanding shares of Harman common stock for cash valued at $112.00 per share for a total approximate value of $8 billion.

3.       There is strong evidence to indicate that the Proposed Transaction was, in large part, subject to a flawed and tainted process in which the Board negotiated only with Samsung and deliberately chose not to conduct any sort of market check before entering into the merger agreement or attempt to contact a single other potentially interested party during these negotiations. Additionally, the Board quickly relinquished any negotiating leverage it had with Samsung by agreeing to enter into a restrictive exclusivity period.

4.       This flawed and unfair process led to the Proposed Transaction, which significantly undervalues Harman, and represents a mere 7.5% premium to the Company's pre-announcement 52-week high. The insufficient Merger Consideration has caused at least one large Harman stockholder, Atlantic Investment Management, holder of a 2.3% stake in the Company, to publicly declare that the Proposed Transaction is undervalued and has publicly stated an intent to vote against it. Additionally, the Company's overall strength and its likely future success render the Merger Consideration unreasonably low, allowing Samsung to acquire the Company at an unfair price to Plaintiff and other Harman stockholders.

5.       Moreover, in addition the unreasonably low consideration contained in the Proposed Transaction, the sales and negotiation process leading up to the Merger Agreement allowed for multiple preclusive deal protection mechanisms, which further call into question the

2

fairness of the Proposed Transaction. Specifically, pursuant to the Merger Agreement, Defendants agreed to (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or providing them with pertinent confidential information; (ii) a notice provision that requires the Company to disclose confidential information about competing bids to Samsung within twenty-four hours; (iii) a provision that provides Samsung with the unfettered right to amend the Proposed Transaction in response to a competing proposal; and (iv) a termination and expense fee provision that requires the Company to pay Samsung $240 million in order to accept an alternative, superior offer.

6.     Such preclusive deal protection provisions, particularly when considered collectively with the Board's inherent conflicts, improperly and substantially limit the Board's ability to act with respect to investing and pursuing superior proposals and alternatives, including a sale of all or part of Harman.

7.     Finally, the Defendants have attempted to solicit shareholder support for the Proposed Transaction through a false and materially misleading Proxy Statement. The Proxy Statement, filed on December 12, 2016 with the Securities and Exchange Commission ("SEC"), provides false and materially misleading statements regarding almost every facet of the Proposed Transaction, including the flawed process leading up to it, insider interests to the deal, the financial analyses performed by the Board's financial advisors, and materials prepared by or for management related to the Proposed Transaction.

8.     Notably, the Proxy Statement does not disclose certain line items related to the Company's management-prepared projections including unlevered free cash flows or stock-based compensation. The Proxy Statement also does not indicate which of the two sets of projections provided (the "*Management Projections and Extrapolations*" and "*Sensitized*

*Projections*"), best represent the view of the Company's future financial prospects in the opinion of Company management.

9. By failing to provide adequate and accurate disclosure of all material information related to the Proposed Transaction, the Defendants have rendered Plaintiff and other Harman public shareholders unable to cast a fully informed vote on the Proposed Transaction.

10. If the Proposed Transaction is approved, the Individual Defendants will have breached their fiduciary duties of loyalty and due care by, *inter alia*, agreeing to sell Harman without first taking steps to ensure that Plaintiff and other Class members (defined below), would obtain adequate and fair consideration under the circumstances.

11. Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Harman's stockholders.

12. Plaintiff alleges that he, along with all other public stockholders of Harman common stock, are entitled to enjoin the Proposed Transaction or, alternatively, to recover damages in the event that the Proposed Transaction is consummated. The consideration offered to Harman stockholders is inadequate.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the claims asserted herein for violations of sections 14(a) and 20(a) of the Exchange Act. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

14. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Harman is incorporated in the State of Delaware and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## THE PARTIES

16.     Plaintiff John Cianti is and has been a shareholder of Harman during all relevant times hereto.  Plaintiff is a resident of the State of New York.

17.     Harman is a Delaware Corporation with a principal place of business located at 400 Atlantic Street, Suite 1500, Stamford, CT 06901.  Harmon common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "HAR".

18.     Defendant Dinesh Paliwal has served as a director of Harman at all relevant times. In addition, Defendant Paliwal serves and has served as the Chairman, President and Chief Executive Officer ("CEO") of the Company since 2007.

19.     Defendant Adriana Brown has served as a director of Harman at all relevant times.

20.     Defendant John Diercksen has served as a director of Harman at all relevant times.

21.     Defendant Ann McLaughlin Korologos has served as a director of Harman at all relevant times.  Additionally, Defendant Korologos is the Lead Director of the Board.

22.     Defendant Edward Meyer has served as a director of Harman at all relevant times.

23.     Defendant Robert Nail has served as a director of Harman at all relevant times.

24.     Defendant Avi Rechental has served as a director of Harman at all relevant times.

25.     Defendant Kenneth Reiss has served as a director of Harman at all relevant times.

26.     Defendant Hellene Runtagh has served as a director of Harman at all relevant times.

27.     Defendant Frank Sklarsky has served as a director of Harman at all relevant times.

28.     Defendant Gary Steel has served as a director of Harman at all relevant times.

29.     Individual Defendants in paragraphs 18 – 28 are, and at all times relevant hereto have been, directors of Harman.

30.     The Defendants named in paragraphs 18 - 28 are referred to herein as "Individual Defendants" or "Director Defendants."

31.     The Director Defendants owe fiduciary duties including good faith, loyalty, fair dealing, due care and candor to Harman and its shareholders.

32.     The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship required them to exercise their best judgment, and to act in a prudent manner and in the best interests of the company's stockholders.

33.     Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in their capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## SUBSTANTIVE ALLEGATIONS

### Harman Background

34.     Harman, as stated in its most recent annual report filed with the SEC on August 11, 2016, is "a leader in the design and engineering of connected products and solutions for automakers, consumers and enterprises worldwide." The Company operates through four core business segments: the Connected Car segment, the Lifestyle Audio Segment, the Professional Solutions segment, and the Connected Services segment.

35.     The Connected Car segment "designs, manufactures and markets connected car systems for vehicle applications to be installed primarily as original equipment by automotive manufacturers."

36.     The Lifestyle Audio segment "designs, manufactures and markets car audio systems for vehicle applications to be installed primarily as original equipment by automotive manufacturers, as well as a wide range of consumer audio products including mid-to high-end loudspeakers and electronics, headphones, embedded audio products for consumer electronics and branded portable wireless speakers."

37.     The Professional Solutions segment "designs, manufactures and markets an extensive range of audio, lighting, video and control, and automation solutions for entertainment and enterprise applications, including live concerts and festivals, stadiums, airports, hotels and resorts, conference centers, educational institutions, command centers and houses of worship."

38.     The Connected Services segment "creates innovative software solutions that integrate design, mobility, cloud and analytics and brings the benefits of the connected world to the automotive, retail, mobile, healthcare, media and consumer electronics markets."

39.     Harman has a long history of financial success, recently evident by their August 4, 2016 release of financial results for the Fourth Quarter and Full Year ended June 30, 2016, in which the Company announced a 12% net sales increase for the year and a 12% increase in net sales for the quarter year-on-year.

40.     In the press release announcing these positive results, Defendant Paliwal spoke for the Company's success while touching on strong growth prospects in the Company's future:

> "In fiscal 2016, HARMAN delivered record revenue, EBITDA and earnings per share," said Dinesh C. Paliwal, Chairman and CEO.  "HARMAN's intelligent, embedded connected car solutions, including unparalleled audio and sound management systems, led to a record-breaking automotive backlog of more than

$24 billion.   Together with a rapidly growing consumer audio business and improving Professional Solutions business, HARMAN has a strong foundation for long-term growth."

Paliwal continued, "In fiscal 2017, we will continue to leverage our comprehensive technology portfolio, including expanded cloud and analytics capabilities, to meet the growing demand for embedded software and services in the automotive, consumer and enterprise markets.   We also presented a longer-term outlook that capitalizes on the opportunities in connected car, mobility and IoT.   With an industry-leading automotive backlog and continued focus on disciplined execution, HARMAN is well positioned to deliver superior financial and operational performance for our customers and shareholders."

41.     Similarly, on the earnings call with analysts discussing these financial results,

Paliwal was again positive on the results and the Company's future prospects:

As we look forward, we see significant growth opportunities across all the divisions.  In the automotive space, the industry is experiencing an unprecedented social and technological transformation, fueled by increasing intelligent connectivity and supported by autonomous vehicles, electrification and urban mobility.  The car is getting an upgrade as never seen before.

HARMAN is well positioned to capitalize on each of these trends.  Let me remind you our portfolio of integrated technologies now include: embedded infotainment solutions ranging from display audio to an intelligent compute platform addressing entry, mid- and high-vehicle classes;  enhanced telematics products and   gateway   solutions; industry-leading cybersecurity; and OTA products for all ECUs, whether  HARMAN supplied  or  non-HARMAN supplied, superior automotive audio technologies like Individual Sound Zones, HALOsonic  and Summit;  Data analytics  and  backend  software services to complement ADAS development in the industry and a number of innovations still in our pipeline.

We have the end-to-end value proposition that automakers are looking for. Building on our strong backlog of awarded business and track record of execution, we expect continued growth in our automotive revenue.  At the same time, due to the staggered timing of various automotive program launches and roll-offs, we expect to see lower growth in 2018, followed by strong growth in 2019 and beyond.  This is a cycle that is common in our business.  We had experienced it before as recently as 2013 as shown on slide 14 of our presentation. We experienced accelerated growth for several years after the transition year in 2013.

In fiscal 2018, we will continue to ramp up new programs and make R&D investments both to deliver on the contracts we have won and to capitalize on the megatrends we discussed earlier.  Longer term, we are confident that we will see

accelerated revenue expansion from our automotive backlog, higher     margin automotive services and increasing market demand for connected car and autonomous driving technologies.

On top of that, there are additional reasons to be excited.  With autonomous driving, the in-car audio experience or sound management becomes even more essential.  With our record $6.6 billion car audio backlog and continued growth in take rate, we expect car audio continue to lead the company in profitability and grow faster than the company average.

In addition, we have confidence in the turnaround of our Professional business. With all the actions we have taken, we are optimistic that we can return margins to historical levels over the medium term.  Together, with the continued growth in our Consumer Audio business and increasing opportunities in Connected Services, we are squarely on the path towards achieving our goal of $11 billion in revenue by 2021.

42.     Moreover, the Company showcased a similar situation, with expected revenue and EBTIDA growth of 7% and 10%, respectively for fiscal 2017 driven in large part by strong performances across all business segments:





43.     Of  significant  note,  the  Company  also  illustrated  a  clear  path  to  continued viability through capitalizing on its position at the forefront of innovation in its industry:



44.    Harman's financial success is not a one-off, but rather an upward trend, as seen by the press release the Company reported on November 3, 2016, which included financial results for the quarter ended September 30, 2016.   Defendant Paliwal again touted the Company's success on the earnings call with analysts, noting the Company's strong product portfolio and growth in the Chinese market:

> I am pleased to report that our fiscal year is off to a very good start, with solid results for the first quarter.  Net sales increased 8% to $1.8 billion.  We expanded our operating margins and delivered a 15% year-over-year improvement in EBITDA.  This puts our EBITDA margin at a company record of 12.9% and we achieved 27% year- over-year improvement in earnings per share.

> I am particularly pleased with the strong results in our Lifestyle Audio division which posted 19% year-over-year revenue growth and 50% EBITDA growth. Our unmatched brand portfolio and product innovations are paying off.

> * * *

> With our innovation, we have been displacing several competitors over the last few years.  As we continue to gain market share, the gap between HARMAN and its competitors has been widening at a faster pace.  We have broken this down for you on page six of your slide deck.

> If you quickly look at slide deck, you will see, since the first quarter of fiscal 2015, we have recognized over $9 billion in automotive revenues.  During the same period, we booked over $13 billion of new awards.  This means our awards are growing faster than our revenue, and our book to bill ratio is 1.4:1.

> In our most profitable business, that is car audio and sound management, the awards grew even faster with a book to bill ratio of 2:1.  Let me talk a little more about our recent wins in the car audio and sound management business.

> Following a successful launch of the Revel brand in Lincoln vehicles, I'm pleased to announce the extension of our business with Ford.   Under this long-term partnership, we will supply B&O PLAY branded car audio systems to Ford's vehicles cross car line globally.

> * * *

> Before I talk about divisions in more details, let me briefly discuss our rapid growth in China, which I am extremely proud of.  You will recall in 2009, our revenue in China was less than $50 million.  Last year, our revenue reached $800 million.  That is 50% cumulative annual growth over the last seven years.  This

quarter, we grew our revenue in China over 40% and we have more than $4 billion of automotive order backlog.

Needless to say, we have been taking market share left and right in China from the competition. We are growing our automotive business through imports and with the Chinese OEMs as well. We have a very strong foundation in China with more than 3,000 people and growing. We have two world-class manufacturing plants, multiple state-of-the- art research and development centers, engineering and design centers. China is an important long-term growth market. We are winning in automotive and our iconic brands are boosting our consumer and professional growth.

* * *

In summary, we are off to a solid start to deliver on our fiscal 2017 targets. We achieved record EBITDA and record earnings per share in the quarter, added over $2 billion of new automotive and software services  awards, and continued  to execute  on  our  backlog successfully. We remain focused on innovation, execution, and driving  cost  leadership  which  have  become  hallmark  of this company's success. And that is applying to all of our businesses.

45.    Despite Harman's clear and continuous record performance, and the fact that it now stand on the verge of enjoying exponential growth as a leader in its expanding business segments and across various emerging markets, the Individual Defendants have determined to foreclose from Plaintiff and other public stockholders of the Company any chance at enjoying these likely futures upsides by selling the Company to Samsung for the insufficient and unreasonable merger consideration.

**The Flawed Process**

46.    The Proposed Transaction is the result of a flawed, single-bidder process during which not even one other potential acquirer was contacted by the Board prior to entering into the Merger Agreement with Samsung.  As the Proxy Statement demonstrates, this process completely failed to create a valid and open auction process, instead creating a process impeded and constrained by the Company insiders whose goal was to maximize their own value in the Company while disregarding the rights of Plaintiff and other Harman public shareholders.

47.     Samsung made its initial overture to the Company in August 2016 when Samsung's President, Young Sohn, met a member of the Company's management team at an industry conference and expressed an interest in collaborating with Harman.

48.     After the initial meeting, Mr. Sohn was directed to speak with Defendant Paliwal. The two subsequently met in early September 2016 to discuss Samsung's interest in a potential acquisition of the Company.

49.     At the time of the meeting between Mr. Sohn and Defendant Paliwal, the Harman Board was not considering any sale of the Company, having discontinued negotiations with a potential strategic counterparty ("Company A") in January 2016.  Prior to that point, the Company had entered into a mutual confidentiality agreement with Company A and, on December 17, 2015, Company A had conveyed to Harman a non-binding proposal to acquire the Company in a mixed cash and stock transaction valued at $115 per share (or a 25.1% premium to the Company's trading price at that point).  The Proxy Statement does not address whether this confidentiality agreement contained a "standstill" provision, similar to the one later included in the confidentiality agreement between Harman and Samsung.

50.     During the summer and fall of 2016, the Board had authorized senior management to explore potentially separating the Company's business into two or more independent public companies.

51.     Additionally, at this time the Board authorized the engagement of a second financial advisor, Lazard Frères & Co. LLC ("Lazard"), presumably to protect against the potential conflicts of interest of Harman's current advisor, J.P. Morgan Securities LLC ("JPM", together with Lazard, the "Financial Advisors").  Both Lazard and JPM served as Financial

Advisors to the Company in connection with the Proposed Transaction and each submitted their own fairness opinion.

52.     JPM, categorized by the Proxy Statement as a "longtime advisor" to Harman, had previously advised the Company during its late-2015 negotiations with Company A.  In the two years preceding the entry into the Merger Agreement, JPM also acted as a joint lead arranger and joint bookrunner on Harman's syndicated facility, as a financial advisor to the Company in connection with its acquisition of Symphony Teleca in April 2015, and as joint bookrunner on offerings of debt securities by the Company.  JPM received fees in aggregate of approximately $11 million for these services.

53.     JPM also has an extensive history with Samsung, having acted as joint bookrunner on the initial public offering ("IPO") of Samsung SDS Co. on October 2014 ($1.1 billion IPO).  JPM has also acted as joint global coordinator and joint book runner on the IPO for Cheil Industries, the de facto holding company of Samsung, in December 2014 (a $1.3 billion IPO).  Additionally, JPM has served as financial advisor to Samsung on Samsung's disposal of equity interests in Samsung Techwin and Samsung Chemicals in June 2015 and as joint bookrunner on the $1.97 billion IPO of Samsung Biologics in October 2016 (the second largest IPO in South Korean history).

54.     The Proxy Statement states that JPM received $17 million in aggregate fees from Samsung and its subsidiaries during the two-year period preceding delivery of its fairness opinion.  It, however, remains unclear whether this amount includes any commissions received in the aforementioned IPOs.

55.     The timing of JPM's involvement with Samsung Biologics IPO, *while simultaneously advising Harman* in a sale to Samsung, casts a cloud of doubt and suspicion

over the financial advisor's impartiality.  Casting a further shadow over JPM's conflicted status during the merger negotiations is that it seemed to have fallen out of favor with the Korean conglomerate at some point in late 2015, only to regain favor with Samsung around the same time the merger process was occurring.

56.     As early as May 5, 2016, Korean news media had reported on JPM returning to Samsung's good graces after JPM was sent a request for proposal with respect to the Samsung Biologics IPO.  This is notable as JPM had allegedly fallen out of favor with Samsung in the prior months over conflicts with the Korean conglomerate regarding its mobile payment system, resulting in the the financial advisor losing out on the opportunity to provide advisory services to Samsung subsidiary Samsung Biopeis in August 2015.

57.     In May 2016, it was announced that Samsung had chosen JPM along with five other advisors to lead Samsung Biologics' IPO.  The $1.97 billion IPO was priced in late October 2016.

58.     On November 10, 2016, Samsung Biologics stock began to trade on the Korea Stock Exchange.  This was perhaps not a coincidence, as only one day later, on November 11, 2016, the Harman Board held a special in-person meeting to receive the fairness opinions of JPM and Lazard, following which the board authorized management to proceed with finalizing the definitive transaction documents.

59.     Lazard's engagement by the Company is also suspicious, and the Proxy Statement is purposefully ambiguous as to the timing of the engagement, stating only that the Board authorized its retention the "summer of 2016."  As Samsung's interest in the Company had been made known during August 2016, and that JPM was also heavily involved with Samsung

through is role in the Samsung Biologics IPO, it is highly likely that Lazard was engaged only to protect against any conflicts of interest.

60.     While the engagement of Lazard should have insulated the Board from conflict during the process, Lazard's non-conflicted status was rendered moot due to the Board's continued use of JPM to serve and act as the key point of communication with various parties. For example, JPM served as the key point of contact between the Company and Company A – clearly it was in JPM's best interest to keep Company A out of any prospective deal with Harman as a JPM brokered deal between Samsung and Harman – a clear boon to JPMs relationship with the Korean conglomerate.

61.     Furthermore, the Proxy Statement is ambiguous as to the specific roles and responsibilities each Financial Advisor held, if they overlapped, and the interplay between them. Each Financial Advisor purportedly conducted their own financial analyses and delivered separate fairness opinions, yet those analyses are presented in a summary and blended form in the Proxy Statement, rendering it a hopeless task to divine the affect, if any, of the Samsung relationship on JPM's fairness opinion.

62.     In addition, it remains to be seen whether the Board received separate presentations from each of JPM and Lazard, or opted for the summary-style joint analysis of the Proxy Statement.  If that were to be the case, then the Board wholly failed in its fiduciary duty to protect against outside conflicts in the sales process, and renders the entire exercise of engaging Lazard illusory and a colossal waste of time and money for the Company.

63.     On September 16, 2016, Samsung and the Company entered into a confidentiality agreement which contained a "standstill" provision.

64.     On October 4, 2016, following several in person and telephonic meetings between representatives of the two companies, Samsung delivered a non-binding letter of intent to acquire the Company in an all-cash transaction for $106.00 per share.  Samsung also conditioned this offer on the execution of an exclusivity agreement.

65.     At an October 6, 2016, Board meeting the Individual Defendants instructed Defendant Paliwal to indicate to Samsung that the Company would only be interested in a transaction which had a meaningfully higher share price than $106.00.

66.     Also at the October 6, 2016 Board meeting, JPM representatives informed the board that Company A had contacted them to inquire as to an informal meeting to renew discussions relating to a transaction between Company A and Harman.

67.     On October 10, 2016, Samsung, through Mr. Sohn, increased its offer for the Company, indicating that it was prepared to offer $109.00 per share in cash to acquire Harman, still conditioned on the Company's entrance into an exclusivity agreement.

68.     Thereafter, the Board met on October 11, 2016, to discuss Mr. Sohn's new offer for the Company and, despite the fact that Company A's representatives had not yet met with JPM, authorized Defendant Paliwal to enter into an exclusivity agreement or a "no shop" if he determined it was necessary to secure an offer of at least $112.00.

69.     Following the agreement to enter into the exclusivity period, but prior to the execution of any letter, JPM engaged *in the only non-Samsung meeting in the entire process*, meeting with Company A's financial advisor.  This October 13, 2016 meeting proved, however, to be window dressing for the Company's ultimate decision to engage with Samsung and only Samsung.

70.     Following JPM's meeting with Company A's financial advisor, the Financial Advisors and members of Company's senior management (*but not the Company Board*) concluded that "Company A was unlikely to be in a position to make a proposal that the Company's board would find attractive, particularly in relation to the all-cash $112 per share proposal made by Samsung."  To further push away Company A, Defendant Paliwal instructed JPM to call Company A's representatives on October 14, 2016 to convey that any new offer for the Company would have to include a cash portion higher than previously offered in December 2015.

71.     Also on October 14, 2016, the Company entered into a letter agreement with Samsung that generally prohibited the Company from soliciting competing acquisition proposals until November 3, 2016, extendable to November 14, 2016 by the mutual agreement of the parties.

72.     With the only available alternative purposefully done away with, the Company and Samsung began due diligence in an effort to close the transaction quickly before the emergence of any third party bid.

73.     Further adding conflict to the process, during a late October 2016 due diligence meeting, Samsung's senior executives informed senior members of the Company management that it would not proceed with the Proposed Transaction unless certain of Harman's senior management team entered into employment agreements, committing to remain with the Company following the close of the merger.

74.     On November 13, 2016, the Board held a special telephonic meeting at which JPM and Lazard "reviewed with the [B]oard their respective analyses of the $112 per share cash consideration to be paid to the Company's stockholders" and delivered to the board each of their

respective fairness opinions.  Following a discussion by the Board, it determined to enter into the

Proposed Transaction and to approve the Merger Agreement.

***The Proposed Transaction***

75.     On November 14, 2016, Harman and Samsung jointly announced the Proposed

Transaction.  The press release states in relevant part as follows:

### ***Samsung Electronics to Acquire HARMAN, Accelerating Growth in Automotive and Connected Technologies***

*Samsung Will Gain Significant Presence in Connected Car Market; Addressable Market Expected to Exceed $100 Billion by 2025*

*All-Cash Transaction Delivers Significant and Immediate Value to HARMAN Shareholders*

*Creates End-to-End Solutions Powerhouse by Combining HARMAN's Leadership in Infotainment, Telematics and Sound Management with Samsung's Best-in-Class Connected Mobility Solutions, Semiconductors, User Experience (UX) and Displays*

*Accelerates Development and Time to Market for Connected Car and Autonomous Driving Innovation*

*Substantial Growth Opportunities Across Automotive, Audio, IoT and Professional Markets*

**SEOUL, Korea and   STAMFORD, CT** – Samsung Electronics (KRX: 005930) ("Samsung") and Harman International Industries, Incorporated (NYSE: HAR) ("HARMAN") today announced that they have entered into a definitive agreement under which Samsung will acquire HARMAN for $112.00 per share in cash, or total equity value of approximately $8.0 billion. Upon closing, the transaction will immediately give Samsung a significant presence in the large and rapidly growing market for connected technologies, particularly automotive electronics, which has been a strategic priority for Samsung, and is expected to grow to more than $100 billion by 2025. HARMAN is the market leader in connected car solutions, with more than 30 million vehicles currently equipped with its connected car and audio systems, including embedded infotainment, telematics, connected safety and security. Approximately 65% of HARMAN's $7.0 billion of reported sales during the 12 months ended September 30, 2016 are automotive-related, and its order backlog for this market at June 30, 2016 was approximately $24 billion.

HARMAN's experience designing and integrating sophisticated in- vehicle technologies, as well as its long-term relationships with most of the world's largest automakers, will create significant growth opportunities for the combined business by enabling it to leverage Samsung's expertise in connected mobility, semiconductors, user experience, displays and its global distribution channels.  In addition, the combination of HARMAN's brands and audio capabilities and Samsung's expertise in consumer electronics will deliver enhanced customer benefits and elevate user experiences across Samsung's complete portfolio of consumer and professional products and systems.

"HARMAN perfectly complements Samsung in terms of technologies, products and solutions, and joining forces is a natural extension of the automotive strategy we have been pursuing for some time," said Oh-Hyun Kwon, Vice Chairman and Chief Executive Officer of Samsung Electronics. "As a Tier 1 automotive supplier with deep customer relationships, strong brands, leading technology and a recognized portfolio of best-in-class products, HARMAN immediately establishes a strong foundation for Samsung to grow our automotive platform.  Dinesh Paliwal is a proven global leader and, in our extensive discussions, we have developed deep respect for him, his strong senior leadership team and HARMAN's talented employees. HARMAN's sustained track record of rapid growth fueled by technology leadership and an unmatched automotive order pipeline reflects its commitment to innovation and customers."

"The vehicle of tomorrow will be transformed by smart technology and connectivity in the same way that simple feature phones have become sophisticated smart devices over the past decade," added Young Sohn, President and Chief Strategy Officer of Samsung Electronics. "We see substantial long-term growth opportunities in the auto technology market as demand for Samsung's specialized electronic components and solutions continues to grow. Working together, we are confident that HARMAN can become a new kind of Tier 1 provider to the OEMs by delivering end-to-end solutions across the connected ecosystem."

Dinesh Paliwal,  HARMAN Chairman, President and CEO, stated, "This compelling all-cash transaction will deliver significant and immediate value to our shareholders and provide new opportunities for our employees as part of a larger, more diversified company.  Today's announcement is a testament to what we have achieved and the value that we have created for shareholders.  Samsung is an ideal partner for HARMAN and this transaction will provide tremendous benefits to our automotive customers and consumers around the world.  Combining Samsung's strengths in leading-edge displays, connectivity and processing solutions with HARMAN's technology leadership and long-standing customer relationships will enable OEMs to provide new offerings for their customers.  Partnerships and scale are essential to winning over the long term in automotive as demand for robust connected car and autonomous driving

solutions increases at a rapid pace. This transaction will bring HARMAN and Samsung's complementary strengths together to accelerate innovation in this space. More broadly, this investment underscores the strength of HARMAN's employees, as well as our success and leadership across our markets. We look forward to working together with Samsung to elevate experiences for consumers worldwide."

### Customer Benefits and Significant Growth Opportunities

Samsung expects the combination to deliver significant growth opportunities and benefits to customers by leveraging Samsung's and HARMAN's complementary technologies, resulting in increased market penetration across important end markets.

• **Automotive**: Combining HARMAN's leadership in new connected car technologies, including its top positions in infotainment, cyber security, over-the-air updates and telematics, with Samsung's significant expertise and experience in connectivity technologies, including 5G, UX/UI, display technology and security solutions, will enhance HARMAN's automotive and connected services businesses to drive greater sales and provide significant benefits as automakers speed the adoption of next-generation connected cars.

• **Audio**: HARMAN's leading brands and cutting-edge audio systems include JBL®, Harman Kardon®, Mark Levinson®, AKG®, Lexicon®, Infinity®, and Revel®. The company also licenses Bowers & Wilkins® and Bang & Olufsen® brands for automotive. All of these brands will greatly enhance the competitiveness of Samsung's mobile, display, virtual reality and wearable products to deliver a fully differentiated audio and visual experience for customers.

• **Professional**: The combination will also expand the combined company's business-to-business platform through its ability to deliver integrated, large-scale audio and visual professional solutions at stadiums, concert facilities and other performance centers such as The John F. Kennedy Center for the Performing Arts and STAPLES Center – home of the GRAMMY Awards®.

• **Connected Services**: Samsung will gain access to HARMAN's 8,000 software designers and engineers who are unlocking the potential of the IoT market. This collaboration will deliver the next generation of cloud-based consumer and enterprise experiences, as well as end-to-end services for the automotive market through the convergence of design, data and devices.

### Operating Structure and Leadership

Upon closing, HARMAN will operate as a standalone Samsung subsidiary, and continue to be led by Dinesh Paliwal and HARMAN's current management team.

Samsung is pursuing a long-term growth strategy in automotive electronics, and plans to retain HARMAN's work force, headquarters and facilities, as well as all of its consumer and professional audio brands.  Samsung believes the combination will increase career development and advancement opportunities for the employees of both companies.

Samsung's Automotive Electronics Business Team, which was established in December of 2015 to identify opportunities for Samsung in the automotive sector, will work closely with the HARMAN management team to realize the full growth potential of the combination.

**Terms of the Transaction**

The purchase price represents a premium of 28% based on HARMAN's closing stock price on November 11, 2016 and a 37% premium to HARMAN's 30-calendar day volume weighted average price ending November 11, 2016. Samsung expects to use cash on hand to fund the transaction.  The agreement has been unanimously approved by the boards of directors of both companies.

The transaction, which is subject to approval by HARMAN shareholders, regulatory approvals and other customary closing conditions, is expected to close in mid-2017.

* * *

*The Inadequate Merger Consideration*

76.    Historical trading prices, the Company's strong financial performance and potential for continued growth, together with its synergistic value to Samsung, establish the inadequacy of the merger consideration.

77.    Pursuant to the terms of the Agreement, the Transaction values shares of Harman at $112.00 per share.  This valuation significantly undervalues Harman, and represents a mere 7.5% premium to the Company's pre-announcement 52-week high.

78.    Additionally, as stated above *supra*, the insufficient Merger Consideration has caused at least one large Harman stockholder, Atlantic Investment Management, holder of a 2.3% stake in the Company, to publicly declare that the Proposed Transaction is undervalued and has publicly stated an intent to vote against it.

   
79.     Specifically, as noted in a *Wall Street Journal* article discussing Atlantic Investment Management's position, head of the firm Alexander Roepers noted that the Proposed Transaction prematurely short-circuited the Company's previously announced growth plan and the potential to get the stock to nearly $200.00 per share.

80.     Moreover, some in the financial media are outright critical of the deal, with one *Wall Street Journal* article decrying the Samsung's bid as not "sweet enough" and noting that it comes amid a "deal frenzy" in the automotive tech space.[1]

81.     Furthermore, as noted in a *Forbes* article published on November 16, 2016, the deal provides significant synergistic benefits to Samsung, who is expected to become a mainstay in the automotive electronics market post-closing, and will allow the Korean conglomerate to "diversify revenues at a time when its bread-and-butter smartphone unit has come under pressure following the Galaxy Note 7 fiasco."[2]  Despite these clear benefits to Samsung, the price offered in the Proposed Transaction significantly undervalues Harman.

82.     Accordingly, the Proposed Transaction will allow Samsung to purchase Harman at an unfairly low price while availing itself of Harman's significant value and upside or long-term potential.

***Potential Conflicts of Interest***

83.     Pursuant to the various employment agreements entered into by numerous members of Company management, including Defendant Paliwal, these Company insiders will receive lucrative employment contracts, including severance agreements, valued at millions of

---

[1]     Wong, Jacky, *Samsung's Bid for Harman Isn't Sweet Enough*, Wall Street Journal, Dec. 15, 2016, *available at*, http://www.wsj.com/articles/samsungs-bid-for-harman-isnt-sweet-enough-1481796593.

[2]     Trefis Team, *Why Samsung is Buying Harman*, Forbes, Nov. 16, 2016, *available at*, http://www.forbes.com/sites/greatspeculations/2016/11/16/why-samsung-is-buying-harman/#2693d3fa23b3.

dollars each.  Clearly such disparate compensation offered to Company insiders when compared to that received by Plaintiff and other members of the class of Harman public stockholders further clouds the objectivity of the Board and Company Management's actions leading up to the Proposed Transaction.

84.     In addition, pursuant to the Merger Agreement, at the Effective Time of the Merger, each outstanding and unvested Company option and/or RSU will automatically vest and/or be converted into the right to receive the Merger consideration.   If the Proposed Transaction is consummated, these Company insiders will receive immediate lump sum cash payments in exchange for their (collective) thousands of currently illiquid Harman options. According to the Proxy Statement, Defendant Paliwal and several other members of Company management stand to gain millions of dollars each in exchange for their Company options and/or RSUs as follows:

| 85.        Name | Stock Options ($) | Stock Appreciation Rights ($) | Time-Based Restricted Stock Units ($) | Performance-Based Restricted Stock Units ($) |
|---|---|---|---|---|
| Dinesh C. Paliwal | — | — | 7,788,032 | 19,855,582 |
| Sandra E. Rowland | 146,544 | — | 2,086,224 | 5,008,452 |
| Phillip Eyler | — | — | 1,416,016 | 3,332,834 |
| Michael Mauser | — | — | 1,780,128 | 4,383,922 |
| David Slump | — | — | 1,068,704 | 2,779,800 |

86.     Clearly, based on the above, the Proposed Transaction is the product of an unfair and inadequate sales process conducted by the Board in breach of its fiduciary duties and which fails to maximizer shareholder value.

***Preclusive Deal Mechanisms***

87.     The Agreement contains certain provisions that unfairly favor the Samsung by making an alternative transaction either prohibitively expensive or otherwise impossible.  For

example, the Agreement contains a termination fee provision that requires Harman to pay up to $240 million to Samsung if the Merger Agreement is terminated under certain circumstances.

88.     The termination fee payable under this provision will make the Company that much more expensive to acquire for potential purchasers, while resulting in a corresponding decline in the amount of consideration payable to Harman stockholders.

89.     The Merger Agreement also contains a "No Solicitation" provision that restricts Harman from considering alternative acquisition proposals by, *inter alia*, constraining Harman's ability to solicit or communicate with potential acquirers.

90.     Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, Defendants agreed to provide the Samsung information in order to match any other offer and ensuring that they have 24 hours to make such an offer, thus providing the Samsung access to the unsolicited bidder's financial information and giving the Samsung the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of the Samsung.

91.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction, and the Proposed Transaction is the product of the Board's breaches of fiduciary duty.

***The False and Materially Misleading Registration Statement***

92.     Finally, the Company has attempted to induce shareholder support for the Proposed Transaction by filing a materially false and/or misleading Proxy Statement, filed on December 12, 2016 with the Securities and Exchange Commission.

93.     Significantly, the Proxy Statement omits or misrepresents material information necessary for Plaintiff and other public stockholders of Harman to make an informed decision regarding whether to vote in favor of the Proposed Transaction.

94.     Specifically, the Proxy Statement fails to provide, or provides materially false information to, Harman shareholders with respect to: (a) the financial projections provided to, or prepared by, the management of the respective parties to the Proposed Transaction and their advisors; (b) the financial valuation analyses prepared by Harman's Financial Advisors, JPM and Lazard in connection with its rendering of a fairness opinion on which the Board purportedly relied upon; and (c) the flawed sales process leading up to the Proposed Transaction.

95.     The Proxy Statement fails to provide, or provides materially misleading information regarding the financial projections provided to, or prepared by, the management of the respective parties to the Proposed Transaction and their advisors, including:

a.     With respect to the *Management Projections and Extrapolations* included in the Proxy Statement, Defendants fail to disclose:

i.     The necessary line items to calculate unlevered free cash flow, as purportedly done by the Financial Advisors in each's *Discounted Cash Flow Analysis*, specifically, unlevered free cash flows or stock-based compensation.

b.     With respect to the *Sensitized Management Projections* included in the Proxy Statement, Defendants fail to disclose:

i.     At what point in the sales process the *Sensitized Management Projections* were actually developed.

c.     Furthermore, the Proxy Statement does not indicate which of the two sets of projections provided (the "*Management Projections and Extrapolations*" and the

26

"*Sensitized Management Projections*") were, in the opinion of Company management, the best representation of the Company's future financial prospects. Such a determination is highly relevant and material as both the *Discounted Cash Flow Analysis* and *Present Value of Future Share Price Analysis* contained in the Proxy Statement arrive at differing ranges of values depending on which set of projections is used, with one being higher than the Merger Consideration and one being within or lower than the Merger Consideration.

        d.     Specifically using the *Management Projections and Extrapolations* yields value ranges of $104.00-$129.25 and $109.50-$124.00 for those two analyses while the use of the *Sensitized Management Projections* results in value ranges of $89.50-$111.00 and $96.00-108.75, respectively.

        e.     Furthermore, the Projections and the Proxy Statement entirely omit any forecasts or information necessary to derive forecasts for Harman's business segments. This is relevant as, according to the Proxy Statement's discussion of the Financial Advisors' *Sum-of-the-Parts Analysis*, each of the Financial Advisors applied EBITDA multiple ranges to the 2017 EBITDA forecast for each segment, each of which "was based on projections prepared by the Company's management and included corporate allocations to each segment."

96.     The Proxy Statement also contains numerous misstatements, ambiguities, or omissions regarding the financial valuation analyses prepared by the Financial Advisors in connection with rendering fairness opinions on which the Board purportedly relied upon, as well as their specific duties and roles in the process, including:

a.      Why the Proxy Statement treats each of financial observations and the valuations purportedly undertaken separately by JPM and Lazard to confirm the fairness of the Proposed Transaction as one in the same.

b.      With respect to the Financial Advisors' *Selected Comparable Companies Analysis*, the Defendants failed to disclose:

i.      Why, if "[e]ach of the Financial Advisors reviewed and analyzed certain financial information, valuation multiples and market trading date related to selected publicly traded companies…" did Lazard and JPM both separately choose the ***same*** five companies to constitute the peer group for this analysis;

ii.     Why each of JPM and Lazard each selected the same multiple reference ranges for both the 2017 Estimated Firm Value to EBITDA (2017E FV/EBITDA) and 2017 Estimated Price to Earnings (2017E P/E);

iii.    Why the analyses does not disclose how stock based compensation was treated in the calculation of EBITDA;

iv.     Why the analyses does not disclose the individual 2017E FV/EBITDA values for each selected comparable company; and

v.      Why the analyses does not disclose the individual multiple of 2017E P/E for each selected comparable company;

c.      With respect to the Financial Advisors' *Sum-of-the-Parts Analysis*, Defendants failed to disclose:

i.      Why the same peer group for each of the four core business segments of Harman were selected by both JPM and Lazard if they were conducting independent analyses;

ii.       Why the same EBITDA multiple ranges were applied to the 2017
EBTIDA forecast for the Company's business segments by both JPM and Lazard
if they were conducting independent analyses;

iii.      Why JPM and Lazard applied identical EBITDA multiple ranges
and arrived at the same value conclusions in their analyses if they were
conducting independent analyses;

iv.      Why the analyses does not disclose the individual 2017E
FV/EBITDA values for each selected comparable company segment;

v.       Why JPM and Lazard applied multiple EBITDA ranges in each of
their analyses that fell entirely below the Mean and Median multiples observed
(as shown below) if they were conducting independent analyses:

| Multiple of 2017E FV/EBITDA | | |
|---|---|---|
| | Mean | Median |
| Connected Car/Car Audio | 6.3x | 6.0x |
| Connected Services | 9.5x | 9.0x |
| Consumer Audio | 8.8x | 9.0x |
| Professional Solutions | 8.3x | 8.3x |

Based on the foregoing, and reflecting the judgment and
experience of the Financial Advisors, each of the Financial
Advisors applied EBITDA multiple ranges of 5.5x to 7.5x, 7.0x to
9.0x, 9.0x to 11.0x, 6.0x to 8.0x and 7.5x to 9.5x to the 2017
EBITDA forecast for the Company's Connected Car, Car Audio,
Connected Services, Consumer Audio and Professional Solutions
segments, respectively. Such forecasts were based on projections
prepared by the Company's management and included corporate
allocations to each segment.  Based on this analysis, each of the
Financial Advisors calculated an implied per share price range for
the Company's common stock of $75.25 to $101.50, rounded to
the nearest $0.25 per share.   Each of the Financial Advisors
compared the implied per share equity value range to the
Company's closing price per share of $87.65 on November 11,
2016 and the merger consideration of $112.00 per share.

d.       With respect to the Financial Advisors' *Selected Precedent Transaction
Analysis*, Defendants failed to disclose:

      i.        Why JPM and Lazard's analyses are treated holistically, with each financial advisor purportedly deriving the same firm value to EBITDA for the twelve-month period prior to the observed deal's announcement;

      ii.       Why the Proxy Statement is silent as to who chose the precedent transaction sampled analyzed by the Financial Advisors, stating only that each reviewed the transactions before reaching their separate (but identical) value conclusions;

      iii.     Why the analyses does not disclose the individual multiple of FV/LTM EBITDA values for each selected precedent transaction;

      iv.     Why the analyses does not disclose the value of each selected precedent transaction was consummated.

e.      With respect to the Financial Advisors' *Discounted Cash Flow Analysis*, Defendants failed to disclose:

      i.        Why JPM and Lazard's financial analyses are treated holistically, rather than separately indicating which firm found what values, given that the Proxy Statement states that "[e]ach of the Financial advisors calculated the unlevered free cash flows that the Company is expected to generate during the fiscal year 2017 through 2017" and that "estimated a range of terminal values for the Company at the end of the ten-year period ending 20126 by applying a perpetual growth rate ranging from 1.5% to 2.5% to the unlevered free cash flow of the Company for the terminal year of the projections.";

      ii.      The reasons for both Lazard and JPM each applying a discount rate of 9.5% to 10.5%, considering that these ranges were supposedly conducted

separately and "based upon each of the Financial Advisors' analysis of the capital structures and costs of equity and debt of the Company and publicly traded companies that may be considered similar to the Company."

      iii.     How stock-based compensation was treated in the calculation of unlevered free cash flows;

      iv.     Why the Proxy Statement does not disclose the terminal pricing multiples corresponding to the assumed perpetuity growth rates.

97.     The Proxy Statement contained material misstatements and otherwise failed to disclose material information about the flawed sales process leading up to the Proposed Transaction, including:

      a.     Whether the confidentiality agreement entered into with Company A on November 2, 2015, contained a standstill provision, and if so, whether that provision functioned to prevent Company A from submitting a topping bid;

      b.     Why no other party besides Samsung or Company A was sought out as a potential strategic partner during the sales process;

      c.     Why no market check was conducted during the sales process.

98.     The information most important to public stockholders in an acquisition is that underlying or supporting the valuation given to their shares by the potential acquirer. Stockholders are entitled to this information, and must use it as a foundation for an informed decision on whether to cast a vote for the Proposed Transaction.  By providing false or materially misleading information, or omitting such information entirely, the Defendants here have hamstrung the Plaintiff and other public stockholders of Harman from exercising their rights as stockholders, and potentially forcing them to vote for a merger which will rob them of the value

of their investment.  In doing so the Defendants have breached their fiduciary duties owed to the Plaintiff and other public stockholders of the Company.

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

99.     In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to act in the best interests of the company's shareholders, including the duty to obtain maximum value under the circumstances.  To diligently comply with these duties, the directors may not take any action that:

      a.     adversely affects the value provided to the corporation's stockholders;

      b.     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

      c.     contractually prohibits them from complying with their fiduciary duties; and/or

      d.     will provide the directors, executives or other insiders with preferential treatment at the expense of, or separate from, the public stockholders, and place their own pecuniary interests above those of the interests of the company and its shareholders.

100.   In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Harman, are obligated to refrain from;

      a.     participating in any transaction where the directors' or officers' loyalties are divided;

b.      participating in any transaction where the directors or officers are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

c.      unjustly enriching themselves at the expense or to the detriment of the public stockholders.

101.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Plaintiff and the other public stockholders of Harman, including their duties of loyalty, good faith, candor, and due care.  As a result, Plaintiff and other Class members will not receive adequate or fair value for their Harman common stock in the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action as a class action, pursuant to FRCP 23, individually and on behalf of all holders of Harman common stock who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

103.    This action is properly maintainable as a class action.

104.    The Class is so numerous that joinder of all members is impracticable.  As of November 10, 2016, there were approximately 69.7 million shares of Harman stock issued and outstanding, resulting in hundreds, if not thousands of stockholders.

105.    There are questions of law and fact which are common to the Class including, *inter alia*, the following.

a.      Whether the Proposed Transaction is unfair to the Class;

b.      Whether Plaintiff and the other members of the Class would be irreparably damaged were the transactions complained of herein consummated;

c.      Whether Defendants violated Federal laws;

d.      Whether the Individual Defendants are acting in furtherance of their own self-interest to the detriment of the Class;

e.      Whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by the Defendants;

f.      whether the Individual Defendants have engaged in self-dealing, to the detriment of Harman public stockholders; and

g.      Whether Defendants have disclosed and will disclose all material facts in connection with the Proposed Transaction.

106.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.   Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

107.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

108.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## FIRST COUNT

## Class Claims Against All Defendants

## For Violations of Section 14(a) of the Exchange Act

109.    Plaintiff repeats all previous allegations as if set forth in full herein.

110.    The Individual Defendants have issued the Recommendation Statement with the intention of soliciting stockholder support of the Merger.

111.    Defendants violated Section 14(a) of the Exchange Act by issuing a Proxy Statement that was materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, the Individual

Defendants should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

112.    Defendants knew that Plaintiff would rely upon their statements in the Proxy Statement in determining whether to vote his shares in favor of the Proposed Transaction.

113.    The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision whether to vote his shares in favor of the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the stockholder vote.

114.    Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

**SECOND COUNT**

**Class Claims Against the Individual Defendants**

**For Violations of Section 20(a) of the Exchange Act**

115.    Plaintiff brings this Exchange Act claim on behalf of himself as individuals and on behalf of all other Harman stockholders.

116.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

117.    The Individual Defendants acted as controlling persons of Harman within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Harman, and participation in and/or awareness of the Company operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control,

directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

118.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

119.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Proxy Statement, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were, thus, directly involved in the making of this document.

120.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.  The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

121.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

122.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy Statement purports to describe the various issues and

information that they reviewed and considered — descriptions which had input from the Individual Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.     Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as class counsel;

B.     Declaring and decreeing that the Proposed Transaction is unlawful and unenforceable, and rescinding and invalidating any merger agreement or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Transaction;

C.     Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction;

D.     Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury of all claims so triable.

Dated: January 13, 2017                    **RIGRODSKY & LONG, P.A.**

                                    By:   _/s/ Brian D. Long_
                                          Seth D. Rigrodsky (#3147)
                                          Brian D. Long (#4347)
                                          Gina M. Serra (#5387)
                                          2 Righter Parkway, Suite 120
                                          Wilmington, DE 19803
                                          Tel.: (302) 295-5310
                                          Fax: (302) 654-7530
                                          sdr@rl-legal.com
                                          bdl@rl-legal.com
                                          gms@rl-legal.com

                                          *Attorneys for Plaintiff*

**OF COUNSEL:**

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
(610) 667-6200